OPINION OF THE COURT
Barbara L. Kaiser, J.
This is a proceeding by Michael Stien, Jr. (the petitioner), the father of Alexandra Stien, a child now four and a half years old, against Joan Stien (the respondent), brought on by a petition, dated June 13, 1984, seeking joint custody of the *610 child and a schedule dividing the time of the child between the parents. In this proceeding petitioner has moved by order to show cause to disqualify the Law Guardian appointed at the outset of the case. The motion was made returnable on September 23, 1985, at which time the court, on the basis of the motion papers and the prior proceedings, indicated an intention to deny the relief requested. Petitioner thereupon, through his counsel, applied for leave to withdraw his petition, indicating that there was now a pending matrimonial action in which the questions raised in the instant proceeding could be tried. The court reserved decision on this application and asked for memoranda from counsel by way of argument to their respective positions. Counsel for the petitioner stated that he intended to appeal the court’s decision on the motion to disqualify the Law Guardian and requested a stay of the Family Court proceeding pending the decision on the appeal. This court granted the stay, which, of course, has effect only in the event that the application for leave to withdraw is denied. As the motion and the application are closely interconnected, both will be determined in this decision and order.
i. The Motion to Disqualify
The motion to disqualify raises the question of the status and the function of Law Guardians in the Family Court: a topic that has of late attracted some academic and legislative attention,[1] but that has not been extensively dealt with by the courts. Because of the importance of the subject in connection with the work of the Family Court, the court will set out at length the reasons for its decision.
Some background information on the history of this case will be helpful. The original petition was dated June 13, 1984. As stated above, it requested joint custody, with the parents sharing physical custody on a schedule. The mother also had filed a petition for custody, in Family Court in Putnam County. On July 2, 1984, in this court, before Judge Adrienne H. Scancarelli, the parties stipulated to a temporary order, pendente lite, which provided in pertinent part as follows:
1. The mother withdrew her petition in the Putnam County Family Court (docket No. V-371-84) and the parties agreed to *611 jurisdiction of the entire matter in the Westchester County Family Court.
2. Temporary custody of Alexandra was given to the mother, with visitation for the father on the following schedule:
6:00 p.m. on Friday to 7:00 p.m. on Sunday on three of four weekends each month, chosen by agreement between the parties.
In months with five weekends, on alternating fifth weekends, commencing with the first such month following the date of the order.
For three consecutive weeks in August 1984, to be chosen by agreement between the parties.
From 4:00 p.m. to 7:30 p.m. every Wednesday.
Each parent was to have reasonable daily telephone access to the child “whenever and wherever” the child was with the other party, including the mother’s workplace, "that access not to be withheld by either party or any third party;” and the father was not to leave the child with a third party for more than three hours during any visitation.
The Law Guardian now sought to be disqualified had been appointed by the court at the outset of the case. She participated in making of the stipulation, and her presence in court was recited in the order that embodied the stipulation.
One month later, by order to show cause dated August 3, 1984, the father brought on a proceeding to hold the mother in contempt for denying him his rights of visitation under the temporary order. A fact-finding hearing was held, in which the Law Guardian fully participated, interrogating the witnesses and making her recommendations to the court at the end of the hearing. Upon the entire record of this hearing, the court refused to hold the mother in contempt, finding, in summary, an absence of intent to violate in the instances complained of, and a certain amount of provocation by the father, which had contributed to the occurrence of some of the instances alleged. Neither party was found entirely blameless, but the court observed — having heard both parties testify at length on direct and on cross-examination — that the father was, in effect, more combat-ready than the mother, more able than she to define the terms of the contest and take the offensive, and very pertinacious in his insistence that all ambiguities be resolved in accordance with his understanding. *612 The result of this hearing was the amendment of. the temporary order to amplify and clarify its terms by providing:
(1) that if either parent wished to change an established visitation date, he or she should give the other at least a week’s notice thereof and allow the other parent to offer a substituted visitation date; if the offer of substitution were refused without substantial reason, the change of visitation would not be a violation of the order; and
(2) that "reasonable telephone access” of a parent to the child was defined to mean not more than one call a day; the call must be between the calling parent and the child unless the calling parent had legitimate business with the other parent; the mother must establish, in consultation with the father, an hour during the day when the father would be able to call at the mother’s workplace and the child would be made available to speak to him.
In all other respects the temporary order remained the same; the court directed that the hearing on the merits should be held as soon as possible.
In due course, the case was placed on the calendar for hearing on the merits. Both parties are still represented by the same counsel, and the same Law Guardian represents the child. This is the posture as the petitioner brings on his order to show cause.
Petitioner challenges the Law Guardian, in essence, on two grounds: that she is biased against him, and that her representation of the child has been incompetent in that she has not included certain specified kinds of investigation in the performance of her functions.
The allegation of bias contains an inherent definitional ambiguity, which should be explained at the outset. The use of the term suggests a conflict of interest. In this case, however, there is no indication of any conflict of interest of the kind that would normally justify a court in disqualifying counsel for a litigant on the motion of that litigant’s adversary. That is, the Law Guardian here has had no prior contact with the moving party that would have given her access to confidential or secret information concerning him that she would be now in a position to use on behalf of her client, to his disadvantage. (Carimati v Carimati, 94 AD2d 659 [1st Dept 1983]; Greene v Greene, 47 NY2d 447, 453.) She has not at any time represented either parent, nor, so far as is known, has she represented any relatives of either of them nor has the court *613 been made aware of any professional relationship that she has had with anyone who might have acquired the kind of confidential information referred to above. The strictures of the Code of Professional Responsibility against that kind of "double agency,” or the appearance of any such thing (Code of Professional Responsibility, EC 4-5, 4-6; Canon 9 generally), clearly are not here at issue.[2]
Bias, therefore, as used by the petitioner in this motion, implies, and seems to connote, that the Law Guardian favors one parent over the other: specifically, here, favors the mother as against the father. The evidence offered to substantiate the claim that the Law Guardian entertains such a bias consists of conversation between the Law Guardian and the father, which the father taped and which, in his papers, he quotes from the tape; a representation that the Law Guardian declined to intervene in behalf of the father to support his claim that he was entitled to three summertime weeks with the child this year instead of the two that the mother offered, and that the Law Guardian would not see the child with the father although she had seen the child with the mother.[3]
There is no allegation that the Law Guardian had any acquaintance with the mother prior to the commencement of this proceeding. All of the behavior of the Law Guardian now complained of by the father took place, according to his affidavit, from and after April 1985.
It is here that the chronology of this case becomes significant.
This Law Guardian had been representing Alexandra since the inception of these proceedings. She was present on July 2, 1984 when the consent order was dictated on the record, the terms of which were the subject of the four days of hearings on alleged violations between September 4, 1984 and November 2, 1984. She actively participated in those hearings. She had ample opportunity to observe both parents, in and out of court. She thus had, at the time of the acts complained of, a considerable background of experience not only with her client but also with both parents. It would be extraordinary if, *614 by the early months of 1985, she had not developed some opinions concerning the temperaments and the behavior of the principal players in this unhappy drama, and on the basis of these, some ideas (at least in an embryonic state) as to the recommendations she would be likely to make to the court. She has, in her answering papers on the motion, indicated that she did not regard it as crucial to the child’s interests that she should interview the child with the father after interviewing her with the mother.[4] She has also indicated that she did not perceive the child’s best interests as implicated in the decision whether the father should have three summertime weeks in 1985 (as he insisted) or two with the child (as the mother proposed), believing that this difference between the parents was rather a part of the power struggle taking place between them, with the child as the stake. The Law Guardian also expressed the view that as between these parents, the proceeding is not a "real custody case, as both parents are fit and loving.”[5]
Whether or not the court agrees with any of these opinions of the Law Guardian is, for purposes of this motion, beside the point. The true issue in this motion is whether it is appropriate for the court to consider dispensing with the services of the Law Guardian whom it has appointed, on grounds such as those alleged by the petitioner herein, in light of the statutory function of the Law Guardian to give "minors who are the subject of * * * court proceedings” independent representation (Family Ct Act §§ 241, 249 [a]), and in the absence of any of the grounds that justify disqualifying a lawyer from representing a client in other types of cases (see references to Code of Professional Responsibility).
It is true that in representing children before this court in custody proceedings a Law Guardian has, in some respects, a heavier burden of responsibility to the client and to the court than does the lawyer representing an adult. In these cases the Law Guardian must protect the child against both parents, and has a duty to resist either of them, or their counsel, if the *615 youthful client’s interests seem to require it. Either parent, or both, may try to persuade the court, pro se or through counsel, that he or she only has the child’s best interests in mind. Either parent, or both, may — and often does — see the child responding badly to the pulling and hauling of a custody battle and place the blame on the other, exonerating him or herself. The bitterer the contention, the greater the need for counsel loyal only to the child, beholden to neither parent, exercising independent judgment, not answerable to either party for her manner of representation.
The Law Guardian is not to decide between the parents. That is the function of the court. She actually has a twofold assignment. In the fact-finding aspect of the case, she must participate in making the record by questioning the parties and the witnesses to elicit information for the record that is relevant in the fact-finding process and may later be of value in making the disposition. In the dispositional phase, she must represent to the court whether in her opinion the client in fact has an ascertainable, reasonably settled point of view that the court can be made aware of (which may not be the case with a child as young as Alexandra); what the child does seem to want; and what in her considered judgment, based on all the facts, would be best for the child. Perfection is not the aim, being unattainable. Neither need the Law Guardian exercise the skills or techniques of the trained mental health professional. First and foremost the Law Guardian is a lawyer, and subject, of course, to the Code of Professional Responsibility. As with other advocates, she may develop a point of view in the course of her representation with which the court, or other counsel, may disagree.[6] This in no way detracts from the effectiveness of the representation of the child. The Law Guardian need not at her peril second-guess the parents or the Judge.[7] Her opinions are no less valuable to the court for being different; varying points of view enlarge the court’s perspective and are helpful in formulating its decision.
It is, in the end, the Judge who makes the decision, based on the record. The Judge may use all, part or none of the Law *616 Guardian’s recommendations. The better informed those recommendations are, of course, the more useful they will be. But the Law Guardian has all of a lawyer’s autonomy. She cannot be required to satisfy standards of performance laid down for her by other counsel in the case, whose motives are dictated by the obligation to represent another party, with his or her own interests, which may or may not coincide with the interests of the child. (See, Matter of Apel, 96 Misc 2d 839; Besharov, Practice Commentary, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 241, p 181.)
It would be a very damaging precedent to grant this motion. Not only would it demean individual Law Guardians as lawyers; it would also be prejudicial to Law Guardians as a class of lawyers dedicated to the representation of children, and not only children as such, but children in serious trouble for which they are in no way at fault, brought on by the inability of their parents to get along with each other, and the desire of each to enlist the children as allies in the power struggle. A Law Guardian is not to be held to account and dismissed for perceiving the struggle in these terms. A rule that would make this Law Guardian answerable to a parent for the manner of her representation of the child in the circumstances of this case would discourage competent, self-respecting lawyers from serving as Law Guardians by removing from such service the privileges of creativity, imagination and autonomy that reward the practice of law. (See, Code of Professional Responsibility, EC 5-1.)
ii. The Application to Withdraw
In the context of the events in this case up to this point, it is hard not to interpret this application as an effort to choose a different and perhaps more favorable forum, where the original one is perceived as not yielding the desired results.
This effort to withdraw the petition, and remove the entire question to the Supreme Court, there to be tried ab initio, is represented to this court as not causing any prejudice to the respondent mother, since it would leave custody of the child with her for the duration of whatever went on. The court cannot accept this as sufficient justification for allowing the petition to be withdrawn.
In the first place, at this stage there is no absolute right to withdraw a petition under CPLR 3217. The unconditional right to discontinue without court order exists only at a point *617 where no party to the case has, in effect, anything invested in it. Once issue is joined, or 20 days after the petition is served, leave must be sought from the court, and conditions can be imposed, in the interests of justice and for the protection of the opposing party. (People ex rel. Weissman v Weissman, 50 AD2d 989 [3d Dept].) In Weissman, petitioner was awarded temporary custody by Family Court, to which the case was transferred by Supreme Court. The mother thereupon left New York with the child and attempted to discontinue the proceeding. Family Court refused to permit unilateral discontinuance, and the Appellate Division affirmed, partly on the ground that the application was untimely under CPLR 3217 (a) and partly (and equally importantly) on the ground that there is a public interest in continuing a proceeding to determine the welfare of a child, which is a "prime concern of the court”. (Supra, p 990; see also, Palmer v Palmer, 62 Misc 2d 73 [Fam Ct, Dutchess County]; Matter of Julie J. v Edwin A., 86 Misc 2d 882 [Fam Ct, NY County].)
Moreover, on the facts of this case as heretofore stated, it is disingenuous to claim, as the petitioner has done, that there can be no prejudice merely because the mother has no cross petition pending. In the first place, she did file her own petition for custody, in Putnam County, and withdrew it as part of the stipulation that was the basis for the consent order giving her temporary custody. Withdrawal of the underlying petition might, in fact, deprive that temporary order of its legal status, since its underpinning in a pending proceeding would have been removed. But even assuming that this court might have power to make a temporary order determining custody ad interim until the jurisdiction of the Supreme Court could be invoked for the same purpose in the pending matrimonial action, there are other grounds of prejudice if withdrawal were to be permitted. The mother has been called on to defend, at length, against allegations of violations of a custody order which, if sustained, might have resulted in her imprisonment. She has engaged counsel and has spent substantial time in court, on matters ancillary to the petition-in-chief. It is far from trivial that she should now be called on to begin all over again in the Supreme Court, whatever the outcome might be. But from the point of view of this court, more important than any of this is the interest of Alexandra, who might well lose her right to independent counsel if the custody matter were transferred to the Supreme Court to be tried ab initio. Counsel for the petitioner, and the petitioner *618 himself, must be aware that this would be the immediate result of allowing the petitioner to withdraw at this juncture.
The court is not persuaded that any part of the purpose of the application to withdraw is to save anyone’s money. Economy is not what is here at stake. If it were, the parties would diligently pursue the merits of the custody proceeding in this court, where it was first commenced, and whose jurisdiction both parties agreed to accept, and would seek to negotiate an uncontested divorce that would embody the final determination of this court. The present course is at very considerable expense to the parties themselves and in another sense, very costly to their little daughter; this court does not minimize the importance to her of her independent counsel, and of an early resolution of the custody questions.
Petitioner’s contention that the court’s ruling against him in the violation proceeding is evidence of bias is without merit.[8]
For all the reasons above expressed, the motion to disqualify the Law Guardian and the application to discontinue the petition are both denied.

. See, Knitzer and Sobie, Law Guardians in New York State: A Study of the Legal Representation of Children, published under the auspices of the New York State Bar Association in April 1984. A legislative proposal was prepared purporting to implement this report, but the status of the proposal is uncertain at this time. The proposal has not been given general publicity.

. In any event the relationship between a Law Guardian and a parent, or counsel for a parent, in a custody case, does not have an adversarial character.

. The answering papers allege that the Law Guardian did ultimately agree to see the child with the father, and tried to arrange an appointment, but the father was unable to make the time. Her effort did not mollify him.

. She states in her answering papers that when she went to interview Alexandra at the mother’s house, the child insisted that the mother be present.

. This may be somewhat unfortunate terminology, but the Law Guardian made it clear that she considered the father and the mother equally fit and equally capable of loving and caring for the child. The court considers such a custody contest to be appallingly real, and very difficult to decide, but will not determine this motion on the inept use of a word.

. The failure of a Law Guardian to develop such a point of view, and to take an active role in the case, has in fact been found by the Appellate Division, Second Department, to be a dereliction of duty in Matter of Jasmine H. (88 AD2d 996).

. There is no risk to the child, in this case, in the custody of either parent, such as the Appellate Division, Second Department, perceived in Matter of Jennifer G. (110 AD2d 801 [1985]).

. Ignorance of prior proceedings in the same case is not esteemed as value in our court system. If it were, there would be no justification for the individual assignment system — in effect for years in the Federal courts, and on the point of being put into effect in the New York courts — under which one Judge handles each case from inception to conclusion.